UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| CRESTON F. COLEMAN,<br>    Plaintiff | §<br>§<br>§ |
| vs. | §   Civil Action No.<br>§<br>§   JURY TRIAL DEMANDED<br>§ |
| WELLS FARGO BANK, N.A.<br>    Defendant | §<br>§ |

## PLAINTIFF'S COMPLAINT AND DEMAND FOR A JURY TRIAL

COMES NOW, Plaintiff, CRESTON F. COLEMAN ("Mr. Coleman"), by and through undersigned counsel, and sues Defendant, WELLS FARGO BANK, N.A. ("Wells Fargo"), and states the following:

## PARTIES

1. Mr. Coleman is an individual, and citizen of the State of Texas and has standing to bring a claim under 42 U.S.C. § 1981 ("Section 1981"), which derives from Section 1 of the 1866 Civil Rights Act.

2. Wells Fargo & Company is the parent company of Wells Fargo. The headquarters for Wells Fargo is located at 101 N. Phillips Avenue, Sioux Falls, SD, 57104. The registered agent for Wells Fargo is Corporation Service Company (CSC), which is located at 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

## JURISDICTION

3. The Court has jurisdiction over this suit pursuant to 28 U.S.C. 1331 because this Complaint alleges a claim under federal law, namely, Section 1981.

4. The Court has supplemental jurisdiction over Mr. Coleman's state law claims pursuant to 28 U.S.C. §1367(a). The state claims are so related to the federal claims that they form

part of the same case or controversy under Article III of the United States Constitution.

5. Venue is proper in this district under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district. Specifically, the events occurred at a branch bank Defendant owns and operates in Garland, Texas.

## BACKGROUND AND FACTS

6. Mr. Coleman is an African American father of three children. He was born and raised in Peoria, Illinois, which is known for its elite high school basketball teams. He was a four-time high school champion basketball player with the esteemed Manual High School. He was also a member of USA Today's 1997 High School Boys National Championship Team. President Bill Clinton invited this team to the White House and honored them for their accomplishments.

7. To give back to his community, Mr. Coleman is an advocate for the Special Olympics and has coached several teams. He also runs a nonprofit organization called Performing Open Hearts ("POH"). Its mission is to offer innovative, creative, solutions-based initiatives and programs for the people of Peoria, Illinois. Its focus is on the next generation and their families. POH is doing an excellent job with youth in that area.

8. As a former basketball player and coach, Mr. Coleman is a large, framed man. He is accustomed to people finding him intimidating or suspicious simply because of his race. Subconsciously, he often tries to make himself look smaller or harmless to avoid the painful discrimination he has suffered based on his race. He had no idea that he would have to take such measures during a visit to a Wells Fargo bank.

9. Mr. Coleman experienced classic "banking while black" at the Wells Fargo bank. It began when he entered the Wells Fargo bank to merely deposit a check. He expected no problems. He has been a Wells Fargo account holder for fifteen years and had proper ID. He had

deposited many checks at Wells Fargo banks in the past without incident.

10. Mr. Coleman's awful dilemma began in early February 2020. He had previously visited a Walmart store to purchase a Money Gram money order to pay rent. His landlord refused to accept the money order because Mr. Coleman had accidentally torn it.

11. This refusal prompted Mr. Coleman to visit Wells Fargo Bank in hopes of depositing the torn money order. The Wells Fargo teller refused to deposit the torn money order and suggested Mr. Coleman contact Money Gram for help. He thanked her and politely took her advice. He contacted Money Gram, and Money Gram sent him a replacement refund check.

12. On or about February 26, 2020, Mr. Coleman revisited the same Wells Fargo branch. Ironically, the same Wells Fargo teller who refused to deposit the money order previously was on duty. Mr. Coleman approached her and reminded her about the money order and their previous conversation. Once again, he politely showed her his state-issued ID, swiped his debit card, and entered his PIN.

13. But the teller again refused to deposit Mr. Coleman's check. She asked him several accusatory and offensive questions that falsely implied that he was attempting to deposit a fraudulent check. Mr. Coleman observed the same teller politely greeting and helping White and Latino patrons. She had a pleasant demeanor with them and deposited their checks without hassling them as she did Mr. Coleman.

14. The teller was cold toward Mr. Coleman. She offered him much different customer service than the polite, warm, and helpful customer service she had shown the previous White and Latino patrons. She racially profiled and humiliated Mr. Coleman. She continued to falsely imply he was attempting to deposit a fraudulent check. She made him stand in line for considerable time while her coworkers gladly assisted White and Latino patrons.

15. Mr. Coleman videotaped the racist encounter. Another Wells Fargo bank employee asked him to stop recording the incident. The employee called the police when Mr. Coleman refused to stop recording the incident.

16. The officer arrived and immediately referred to Mr. Coleman's large and intimidating size albeit Mr. Coleman was not loud, threatening, or aggressive. The officer also stayed in a ready position with his hand close to his gun. Mr. Coleman kept his voice low and respectful to the Wells Fargo employees and the officer. He became fearful of the officer knowing that police interactions with Black men have often resulted in police officers tragically shooting Black men.

17. To make the police officer and bank employees feel less intimidated or fearful because of his size and race, Mr. Coleman did what he has learned from such racist encounters, he tried to make himself seem smaller by sitting down. He did not want the officer's inherent fear of big Black men to become a reason for the officer to pull his gun and start shooting.

18. While sitting in deep humiliation and fear for his life, Mr. Coleman wept. An African American female patron, who witnessed the episode, became upset with the Wells Fargo employees and officer. She expressed her pain and cried about the incident. She knew the Wells Fargo employees and the police officer had racially profiled Mr. Coleman. She tried to console Mr. Coleman.

19. Mr. Coleman grew weary of the discrimination, asked the tellers for his check, and left the bank. He went to another Wells Fargo branch and deposited the check.

**WELLS FARGO'S ALLEGED HISTORY OF RACIAL DISCRIMINATION**

20. Mr. Coleman isn't the only African American who sued Wells Fargo for racial discrimination. Allegedly, "Banking while black" occurs frequently at Wells Fargo banks.

Additionally, like it did to Mr. Coleman, Wells Fargo has called local police departments on others who allegedly suffered the occurrence of "banking while black" at a Wells Fargo bank. Below are several recent examples:

21. Clarice Middleton went to Wells Fargo to cash a check from a real estate company. The real estate company was an account holder at Wells Fargo. Some bank employees allegedly accused Ms. Middleton of trying to cash a fraudulent check and eventually called the police. The police officer took no action and left after Ms. Middleton showed her identification and the check stub. Ms. Middleton sued Wells Fargo for racial discrimination and defamation.

22. A Wells Fargo account holder, Jabari Bennett, allegedly went to Wells Fargo to withdraw $6400 to purchase a used Toyota Camry. Mr. Bennett had recently moved from Atlanta, Georgia, to Wilmington, DE. Hence, the teller questioned his out-of-state driver's license, notwithstanding Mr. Bennett making the bank aware of his relocation and new address. Mr. Bennett alleged the teller didn't believe he was an account holder, and the branch manager asked him to leave the premises. Mr. Bennett was shocked but left. He returned later to withdraw money from his account. Again, the teller refused, and the manager threatened to call the police.

23. Benndrick Watson allegedly went to a Wells Fargo branch to open a business account for his law practice. Mr. Watson was already a personal checking account holder at the bank. While a banker was searching for corporate records, he saw a record label business for Mr. Watson. The branch manager came to assist, and Mr. Watson heard the manager use the N-word. The manager apologized, but Mr. Watson left. The manager continued apologizing as Mr. Watson went to his car. Eventually, the manager resigned from the bank. Mr. Watson sued Wells Fargo in federal court in Florida.

## COUNT I
### Violation §1981

24. Mr. Coleman repeats, realleges, and incorporates the allegations set forth in the foregoing paragraphs.

25. Wells Fargo's racially discriminatory actions toward Mr. Coleman violated Section 1981 of the Civil Rights Act of 1866, as amended, by 42 U.S.C. § 1981, et seq.

26. Wells Fargo's racially discriminatory actions caused Mr. Coleman great public humiliation, mental anguish, and shame. Ultimately and inexcusably, Wells Fargo deprived Mr. Coleman of his precious civil rights, i.e., the right to make and enforce contracts on the same level as any white person. Again, Wells Fargo's actions violated 42 U.S.C. § 1981.

27. Further, Wells Fargo is liable for its employees' racist and discriminatory behavior pursuant to the doctrine of respondeat superior.

28. Because Mr. Coleman is an African American man, Wells Fargo employees refused to deposit Mr. Coleman's check and falsely accused him of committing a crime, e.g., depositing a fraudulent check. The treatment of Mr. Coleman by the tellers was inexplicable. He presented a state-issued ID, was a long-time verified Wells Fargo account holder, and the teller knew he had followed her advice to get a new check from Money Gram.

29. Wells Fargo's racially discriminatory conduct toward Mr. Coleman was intentional and malicious. What is more, the tellers acted with reckless indifference toward Mr. Coleman by calling the police on Mr. Coleman without just cause. We all know in America, a call to law enforcement concerning even an innocent Black man like Mr. Coleman can tragically leave that Black man seriously injured or dead.

## COUNT II
### Intentional Infliction Of Emotional Distress

30. Mr. Coleman repeats, realleges, and incorporates the allegations set forth in the foregoing paragraphs.

31. Wells Fargo's racially discriminatory and needlessly dangerous actions towards Mr. Coleman intentionally or recklessly caused Mr. Coleman to experience severe emotional distress.

32. Wells Fargo's actions towards Mr. Coleman were malicious.

## COUNT III
### False Imprisonment

33. Mr. Coleman repeats, realleges, and incorporates the allegations set forth in the foregoing paragraphs.

34. By calling the police on Mr. Coleman based on false and malicious allegations, Wells Fargo willfully caused the police officer to detain Mr. Coleman unlawfully. Wells Fargo had no justifiable reason for calling the police. They called the police due to racial profiling.

35. Wells Fargo's wrongful acts caused Mr. Coleman to suffer severe emotional distress.

## DAMAGES

36. Mr. Coleman has suffered shame, embarrassment, public humiliation, and mental anguish directly and proximately caused by Wells Fargo's actions. Consequently, Mr. Coleman is entitled to an award for compensatory and punitive damages from Wells Fargo.

## ATTORNEY FEES & COSTS

37. Pursuant to 42 U.S.C. 1988(b), Mr. Coleman may recover attorney's fees and costs since Mr. Coleman had to retain the services of Corbett & Corbett LLP and agreed to pay Corbett & Corbett LLP a reasonable fee.

## DEMAND FOR A JURY TRIAL

38. Mr. Coleman demands a trial by jury on all counts.

## **PRAYER**

**WHEREFORE, PREMISES CONSIDERED**, Mr. Coleman prays that Wells Fargo be cited to appear and answer herein. And that upon final trial hereof, Mr. Coleman is awarded judgment from Wells Fargo for compensatory, economic, noneconomic, exemplary, and liquidated damages in whatever amount Mr. Coleman is entitled, including interest, costs, and reasonable attorney's fees.

Respectfully submitted,

***Corbett & Corbett LLP***
1910 Pacific Avenue, Suite 6075
Dallas, Texas 75201
Telephone: (469) 726 – 2626
Facsimile: (214) 788 - 1202
*/s/Chloe Corbett, Esq*.
Texas Bar No: 24095735
 chloe.corbett@corbettfirm.com
*/s/Augustus Corbett, Esq*.
Texas Bar No: 24058930
acorbett@corbettfirm.com